**CECOS INTERNATIONAL, INC. and Niagara Recycling, Inc., Plaintiffs,**

v.

**Thomas C. JORLING, as Commissioner of the New York State Department of Environmental Conservation, and the New York State Department of Environmental Conservation, Defendants,**

**and**

**City of Niagara Falls, County of Niagara, Great Lakes United, Lasalle and Niagara Demand, Campaign to Save Niagara, Ecumenical Task Force of the Niagara Frontier, and Society to Oppose Pollution In Towns, Defendants–Intervenors.**

No. 87–CV–1186.

United States District Court,
N.D. New York.

Feb. 23, 1989.

Rivkin Radler Dunne & Bayh, Chicago, Ill. (Warren S. Radler, Barbara Guibord, James P. Rigano, of counsel), Sugarman Wallace Manheim & Schoenwald, Syracuse, N.Y. (Charles Manheim, Timothy J. Perry, of counsel), for plaintiffs.

Robert Abrams, Atty. Gen. of the State of New York, Environmental Protection Bureau, New York City (Stuart Miller and John J. Privitera, Asst. Atty. Gen., of counsel), for Jorling and N.Y.S. Dept. of Environmental Conservation.

Milbank Tweed Hadley & McCloy, New York City (Joseph S. Genova, Brent K. Olsson, of counsel), for Concerned Citizens Organization.

Berle Kass & Case, New York City (Michael Gerrard, of counsel), for Niagara Co. and City of Niagara Falls.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

On August 24, 1987, plaintiffs, CECOS International, Inc. and Niagara Recycling, Inc. (collectively referred to herein as "CECOS"), commenced the present action seeking a declaratory judgment that § 27–1105 of the New York State Environmental Conservation Law ("ECL"), as amended on August 4, 1987 ("the new siting law"), violates the due process and equal protection clauses of the fourteenth amendment. Complaint at p. 9, par. 1. CECOS is also seeking a declaratory judgment that the new siting law constitutes a taking without just compensation in violation of the fifth and fourteenth amendments to the United States Constitution. *Id.* CECOS is further seeking to have this court preliminarily and permanently enjoin defendants, Thomas C. Jorling, as Commissioner of the New York State Department of Environmental Conservation, and the New York State Department of Environmental Conservation ("the state defendants") from enforcing and applying the new siting law to it. *Id.* at p. 9, par. 2.

Finally, in addition to declaratory and injunctive relief, CECOS is seeking an award of monetary damages. *Id.* at p. 10, par. 3. Since the initial filing of the complaint and the order to show cause, however, CECOS has changed its position. Specifically, in its first reply memorandum of law [1] CECOS explicitly stated that it is not seeking monetary damages or other retrospective relief. Plaintiff's Reply Memorandum of Law I at p. 2. In addition, CECOS emphasized that change in position by further advising the court that it is not pursuing its claim for monetary damages. *See,* Letter from Warren S. Radler (September 25, 1987).

On September 10, 1987, this court heard oral argument on a motion to preliminarily enjoin the state defendants from enforcing the new siting law as to CECOS. At oral argument, CECOS conceded that there was less urgency for the issuance of a preliminary injunction than it had originally anticipated. Therefore, at the court's suggestion and with the agreement of the parties, the court converted the Order to Show Cause seeking a preliminary injunction to a motion for summary judgment under Fed. R.Civ.P. 56. Following oral argument, the parties were then given an opportunity to present additional memorandums of law to the court.

On September 10*th*, 1987, the court also considered two motions to intervene pursuant to Fed.R.Civ.P. 24. In particular, Great Lakes United, LaSalle and Niagara Demand, Campaign to Save Niagara, Ecumenical Task Force of the Niagara Frontier, and Society to Oppose Pollution in Towns ("the concerned citizens organizations") moved to intervene as party defendants in this action. Similarly, the City of Niagara Falls and the County of Niagara ("the municipal defendants") also moved to intervene as defendants. The court granted both motions to intervene. The municipal defendants submitted a memorandum of law, whereas the concerned citizens organizations have simply adopted the various memorandums of law submitted by the other defendants.

The court has carefully considered all of the memoranda of law, the supplemental letters of counsel, and the voluminous exhibits submitted with respect to this summary judgment motion, and following constitutes the court's decision.

## BACKGROUND

CECOS operates of a solid waste management facility on approximately 385 acres near Niagara Falls. Belmore Affidavit (9/8/87) at pars. 3 & 5. That solid waste consists of both hazardous and non-hazardous waste. *Id.* at par. 3. CECOS is engaged in landfill activity at the Niagara Falls site, as well as operating a wastewater treatment facility. Tarnawskyj Affidavit (8/21/87) at par. 5. According to Peter Tarnawskyj, CECOS' Project Manager, the landfill activity is CECOS' principal source of income at that site. *Id.* at par. 5. Presently there are four Secure Chemical Management Facilities ("SCMF") (landfills) at the Niagara Falls site, all of which are filled to capacity and can no longer be used. *Id.* at par. 6. In addition, there is another SCMF (No. 5), which CECOS projected would be out of capacity in June, 1988.[2] *Id.* at 33; DiLibero Affidavit (8/21/87) at pars. 3 and 4.[3] (Whether CECOS' projection was correct is not known to the court.)

In the past it has taken a long time to finalize a permit application to build and operate a hazardous waste disposal unit

---

1. On September 10, 1987, CECOS filed a reply memorandum of law in response to the memorandum of law submitted on behalf of the City of Niagara Falls and the County of Niagara. That reply will be referred to herein as plaintiff's reply memorandum of law I. Following oral argument, the court granted CECOS permission to file another reply memorandum of law, which it did on September 16, 1987. That reply will be referred to herein as plaintiff's reply memorandum of law II.

2. CECOS' Project Manager claims that SCMF 5 would have been filled by mid–1987 except CECOS artificially reduced the volume of material coming from its customers. Tarnawskyj Affidavit at par. 33, n. 3.

3. Ramsey G. DiLibero is the President of CECOS, and he has held that position since 1985. DiLibero Affidavit (8/21/87) at par. 1.

and to obtain the final permit, thus CECOS began the process of developing the sixth landfill known as Secure Chemical Residue Facility No. 6 ("SCRF 6") in 1984, shortly after SCMF 5 began operating. *Id.* at pars. 7 and 8. It took CECOS approximately two years and an investment in excess of seven million dollars, but finally, in February of 1987, the Department of Environmental Conservation ("DEC") issued a notice pursuant to § 70–0109 of the New York Environmental Law indicating that the application for SCRF 6 was complete.[4] *Id.* at par. 23, and exhibit O thereto. As provided for under state regulations, after a notice of complete application has been issued, along with a draft permit, the DEC may conduct a public hearing process, which may include an adjudicatory hearing. *See,* 6 N.Y.Comp.Codes R. & Regs. tit. 6, § 624 *et seq.* (1985).

On June 2, 1987, that adjudicatory proceeding commenced with a Public Statement Hearing. *Id.* at par. 25. On June 3, 1987, the Administrative Law Judge ("ALJ") held an issues conference and decided to continue the hearing to determine the proper issues for adjudication. *Id.* at par. 28. Specifically, the ALJ instructed the parties to brief the issue of whether the old siting law required that CECOS' proposal be reviewed by a siting board. Drew Affidavit (9/4/87), Exhibit 2 thereto. During that time the parties, including CECOS and the DEC staff, began conducting informal discovery, anticipating that the hearing would reconvene in the late summer of 1987. *Id.*

Coincidentally, in the interim, on August 4, 1987, Governor Cuomo signed into law Assembly Bill 7835–C. That Assembly Bill amended some sections of the ECL, which govern the siting of new hazardous waste disposal facilities. Several provisions of that legislation are at the heart of this lawsuit.

Prior to the siting law amendments, CECOS was not required to obtain a Certificate of Environmental Safety and Public Necessity ("certificate") because under the previous siting law there was a "grandfather exception." The grandfather exception expressly exempted those, such as CECOS, seeking to expand existing facilities, from having to obtain a separate siting certificate.[5] The DEC specifically determined that the SCRF 6 was exempt under the old siting law, and the regulation thereto. Tarnawskyj Affidavit, Exhibit S thereto. Now, the effect of the new siting law is to eliminate CECOS from that grandfather exception. Specifically, the new siting law provides, in part:

> Notwithstanding the provisions of subdivision one of this section, the following industrial hazardous waste treatment, storage and disposal facilities shall not be subject to the provisions of this title: . . . .
>
> (d) Additional facilities, *other than land disposal facilities,* to be located at the site of an existing facility, *the operation of which will be substantially similar to that of the existing facility* with respect to the mode of waste management and the type and quantity of hazardous waste being managed.

N.Y.Envtl.Conserv.Law § 27–1105(2)(d) (McKinney Supp.1989) (emphasis added). Therefore, because CECOS is a land dispos-

---

4. Section 70–0109(1)(a) of the New York Environmental Conservation Law states:
   On or before fifteen calendar days after the receipt of an application for a permit which has been filed in a manner and in a form prescribed by the department, the department shall mail written notice to the applicant of its determination whether or not the application is complete.
   N.Y.Envtl.Conserv.Law § 70–0109(1)(a) (McKinney 1984). In addition, § 70–0109(1)(e) expressly states:
   If the department determines the application is complete, the notice shall so state.

N.Y.Envtl.Conserv.Law § 70–0109(1)(e) (McKinney 1984).

5. Previously § 27–1105(1)(d) provided that the siting law did not apply to:
   facilities located at the site of an existing facility, the operation of which is substantially similar to the existing facility with respect to the mode of waste management and the type and quantity of hazardous waste being managed.
   1987 N.Y.Laws Ch. 618, § 8(2)(d).

al facility seeking to expand its existing facility by the construction of SCRF 6, it is no longer exempt from the siting board requirements.

In addition, the new siting law provides, in part:

> After the publication of siting criteria pursuant to subdivision one of section 27–1103 of this title, no person may commence construction or operation of the following industrial hazardous waste treatment, storage and disposal facilities, hereinafter referred to as "facility", without having received a certificate of environmental safety and public necessity from the facility siting board as hereinafter provided: (a) any new off-site facility;
>
> (b) any new commercial facility, wherever situated;
>
> (c) any new incineration facility, wherever situated;
>
> (d) any new land disposal facility, wherever situated; and
>
> (e) any expansion, wherever situated, of the aggregate land disposal capacity of an existing land disposal facility.

N.Y.Envtl.Conserv.Law § 27–1105(1)(a)–(e) (McKinney Supp.1989). Thus, under § 27–1105(1)(e), existing land disposal facilities, such as CECOS, are expressly eliminated from the former grandfather exception, and are required to obtain siting board approval.

Finally, the new siting law established four exceptions to the siting board certificate requirement. Only one of those exceptions is relevant to this lawsuit.[6] In particular, the new siting law provides, in relevant part:

> Notwithstanding the provisions of subdivision one of this section, the following industrial hazardous waste treatment, storage and disposal facilities shall *not* be subject to the provisions of this title:....
>
> (b) A land disposal facility located at the site of an existing land disposal facility where both the existing facility is or was and the proposed facility will be used solely for the disposal of non-incinerable residues from the *on-site* thermal destruction or chemical or aqueous treatment *of wastes generated at the site of such facilities;*

N.Y.Envtl.Conserv.Law § 27–1105(2)(b) (McKinney Supp.1989) (emphasis added). As the state defendants pointed out, existing land disposal facilities proposing to enlarge their existing facility to dispose of non-incinerable residues from the on-site thermal destruction or chemical or aqueous treatment of wastes generated on-site fall within that exception. Thus, even though the new siting law excludes those seeking to expand non-commercial landfills (i.e. those facilities generating hazardous waste on-site and disposing of it in a certain manner on-site) from the certificate requirement, CECOS cannot avail itself of that exception because it is a commercial operator (i.e. it does not dispose of hazardous waste generated on-site). Interestingly, in

---

**6.** The first exception is for facilities that "do[ ] not require permits pursuant to title nine of this article." N.Y.Envtl.Conserv. § 27–1105(2)(a) (McKinney Supp.1989). That means facilities that do not handle hazardous waste. *See* N.Y. Envtl.Conserv. § 27–0913(1) (McKinney 1984). As the operator of a solid waste management facility, which handles hazardous waste, CECOS clearly requires such a permit, and in fact had obtained a draft permit prior to the passage of the new siting law.

The third exception is for "[a] facility that has been determined by the department to have no significant environmental impact pursuant to article eight of this chapter [the Environmental Quality Review Act];...." N.Y.Envtl.Conserv. § 27–1105(2)(a) (McKinney Supp.1988). CECOS clearly does not fall into that category of facilities.

The fourth exception is for:
Additional facilities, *other than land disposal facilities,* to be located at the site of an existing facility, the operation of which will be substantially similar to that of the existing facility with respect to the mode of waste management and the type and quantity of hazardous waste being managed.
N.Y.Envtl.Conserv. § 27–1105(2)(d) (McKinney Supp.1989) (emphasis added). According to the state, the purpose of that exception is to allow "modest expansions of temporary storage and treatment facilities without siting board review." State Defendants' Reply Memorandum of Law at p. 6 n. 3. It should be noted that CECOS is *not* asserting that there is any disparity in treatment between it and those facilities which fall into those other three statutory exceptions to the siting board review process.

addition to CECOS, there is only one other hazardous waste landfill disposal facility in New York (SCA Services in the Town of Porter) to which these provisions of the new siting law apply.

Following the passage of the new siting law, the ALJ suspended the adjudicatory hearing to allow the DEC staff to advise CECOS of the procedure it would have to follow under the new siting law. Drew Affidavit, Exhibit 1 thereto. The DEC notified CECOS in writing on August 17, 1987, that the adjudicatory proceeding on the SCRF 6 application would be held in abeyance until a facility siting board made a decision as to whether to grant or deny a certificate to CECOS. Tarnawaskyj Affidavit at par. 31, and Exhibit T thereto. Since oral argument, CECOS has advised the court that in November, 1987, it submitted an application for a certificate under the new siting law amendments. Letter from Warren S. Radler (February 26, 1988). As a result of that application, the administrative hearing was reopened on March 29, 1988. A public statement hearing was held then, followed by an issues conference on March 30, 1988. Letter from James P. Rigano (July 11, 1988). Administrative Law Judge Pearlstein issued a ruling outlining the issues that would be the subject of the hearing, which reconvened on August 2, 1988. *Id.*

## DISCUSSION

### I. Abstention

Before addressing the substantive issues raised by this motion, the court must determine whether, as defendants urge, it should abstain from hearing this matter altogether. The court is well aware of its "virtually unflagging obligation ... to exercise the jurisdiction" granted to it. *Colorado River Water Conservation District*

*v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). The court is equally aware, however, of the judicial doctrine of abstention which has developed over the years whereby federal courts decline to exercise their jurisdiction under certain circumstances. Although not sharply defined, four general categories of abstention have emerged,[7] under which it is proper for a federal court to abstain from adjudicating federal claims.

The state defendants urge this court to abstain from adjudicating CECOS' claims based upon two of those categories. First, the state defendants suggest that abstention is proper under *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (*"Burford* abstention"), because adjudication of CECOS' claims by this court would disrupt the coherence of New York's regulatory scheme with respect to hazardous waste disposal. Second, the state defendants suggest that abstention is proper under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (*"Younger* abstention"), because CECOS is seeking to enjoin a pending state administrative proceeding. The municipal defendants assert that this court should abstain under *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (*"Pullman* abstention"), and allow the state court to determine the scope of the new siting law. The court is not persuaded, however, that it should refrain from deciding this motion based upon any of those three categories of abstention.

### A. Pullman Abstention

■ As explained by the Supreme Court in *Colorado River,* abstention is appropriate based upon *Pullman:*

['I]n cases presenting a federal constitutional issue which might be mooted or

---

7. The fourth category of abstention is derived from the Supreme Court's decision in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). That abstention doctrine is reserved for "exceptional circumstances," *id.* at 817, 96 S.Ct. at 1246, and thus the Supreme Court has instructed that the applicability of such abstention is limited to those situations where the three traditional categories of abstention do not apply. *Id.* at 817–18, 96 S.Ct. at 1246; *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 14–15, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983). Heeding that instruction, and because *Colorado River* abstention has not been advanced by any of the defendants to this action, the court will not consider its applicability here.

presented in a different posture by a state court determination of pertinent state law.'

*Id.* 424 U.S. at 814, 96 S.Ct. at 1244 (citation omitted). Thus, a federal court may abstain to "avoid deciding an issue of federal constitutional law by allowing a state court to resolve an issue of state law." *American Disposal Services, Inc. v. O'Brien,* 839 F.2d 84, 87 (2d Cir.1988) (citing *Pullman* ). Abstention under *Pullman* is not proper, however, "when a state statute is not 'fairly subject to an interpretation which will render unnecessary' adjudication of the federal constitutional question." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) (citation omitted). Abstention is unsuitable under those circumstances because "[a]bsention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* (quoting *Colorado River,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)).

In *Hawaii Housing Authority,* the Supreme Court held that *Pullman* abstention was inapplicable due to the lack of an uncertain question of state law. Specifically, the Court in *Hawaii Housing Authority* found that the challenged statute was clear and unambiguous on its face. The Court further found that there was no reasonable limiting construction which could be afforded to the statute. *Accord, City of Houston, Texas v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 2513, 96 L.Ed.2d 398 (1987) (citations omitted) ("If the statute is not obviously susceptible of a limiting construction, then even if the statute has 'never [been] interpreted by a state tribunal ... it is the duty of the federal court to exercise its properly invoked jurisdiction.' ").

In determining whether *Pullman* abstention is appropriate, in *Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370 (N.D.N.Y.1987), then Chief Judge Munson stated:

The Second Circuit has identified three essential elements which must be present before *Pullman* abstention may be invoked: (1) The state statute to be construed or the state law to be applied must be uncertain; (2) resolution of the federal issues presented must depend upon the construction to be given to the ambiguous state law; and (3) the state law must be susceptible of an interpretation that would render decision of the federal constitutional question unnecessary or would materially alter the nature of the constitutional questions raised.

*Id.* at 401 (citing *McRedmond v. Wilson,* 533 F.2d 757, 761 (2d Cir.1976)). Thus, it is obvious that before a federal court may abstain based upon *Pullman,* it is critical that the court find that the challenged state statute is ambiguous. That is so because, as the Second Circuit has astutely recognized:

A clearly-worded law leaves even the most constitutionally-sensitive state court little room to maneuver its way to a saving construction. Remand under such circumstances serves no purpose of comity; it wastes the plaintiff's, the defendant's, and the state court's time, and causes unseemly delay in the federal court adjudication.

*Moe v. Dinkins,* 635 F.2d 1045, 1048 (2d Cir.1980), *cert. denied,* 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982).

As in *Hawaii Housing Authority,* the provisions of the new siting law being challenged here are *not* ambiguous, and CECOS does not allege otherwise in its complaint. In fact, CECOS concedes, "no interpretation is necessary to establish the unconstitutionality of the statute." Plaintiff's Reply Memorandum of Law II at p. 5. Indeed, because none of the defendants have proffered any possible alternative or limiting construction of the challenged provisions of the new siting law, it appears to the court that the parties are in complete agreement as to the import and effect of the challenged provisions of the new siting law. The new siting law is unequivocal: those land disposal facilities which dispose of hazardous waste generated at other establishments and which are seeking to expand existing facilities, such as CECOS, must obtain a certificate from the siting board. Thus, because the statute at issue is unambiguous this court cannot, as the municipal defendants suggest, abstain on the basis of the *Pullman* doctrine.

## B. Younger Abstention

■ The state defendants contend that this court should decline to consider this action based upon the abstention doctrine emanating from the Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In *Younger* the Court held that a federal court should not enjoin a pending state criminal proceeding except in the unusual situation where an injunction is needed to prevent serious and immediate irreparable injury. The Court's decision in *Younger* was based upon the equitable doctrine that "courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44, 91 S.Ct. at 750. In addition to that equitable consideration, the *Younger* Court's decision also rested upon the " 'more vital consideration' of the proper respect for the fundamental role of States in our federal system.' " *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 626, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) (quoting *Younger*, 401 U.S. at 44, 91 S.Ct. at 750). Specifically, in *Younger*, Justice Black explained:

> What the concept [comity] does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

401 U.S. at 44, 91 S.Ct. at 750.

In addition to recognizing the propriety of abstaining where a litigant is seeking to enjoin a pending state criminal proceeding, in a companion case to *Younger*, the Supreme Court held that federal courts should abstain where they are asked to issue a declaratory judgment pursuant to which a state criminal prosecution is pending. *Samuels v. Mackell*, 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971).

That is so because "ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid." *Id.* at 72, 91 S.Ct. at 767. Thus, it is beyond dispute that courts should ordinarily refrain from enjoining pending state criminal actions or issuing declaratory judgments with respect to such proceedings.

Recognizing that those same comity and federalism concerns arise in other settings, the Supreme Court has expanded the *Younger* doctrine beyond the criminal sphere. Therefore, a federal court may also properly invoke *Younger* abstention in certain civil proceedings where important state interests are implicated. *See, e.g., Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482, *reh. denied*, 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975) (federal court should abstain under *Younger* from hearing federal challenge to state nuisance statute where state court nuisance action had been filed seeking civil penalties for showing "obscene" movies). In recent years the Supreme Court has also expanded the *Younger* doctrine to apply to cases where there is a pending state administrative proceeding; provided, however, that there is available to the litigant a method for state court review of the constitutional claims. *See, e.g., Dayton Christian Schools*, 477 U.S. at 627–29, 106 S.Ct. at 2723–24 (*Younger* abstention invoked where a state human rights commission was investigating sex discrimination allegations and where an administrative proceeding pertaining to those allegations was ongoing); *Middlesex County Ethics Committee v. Garden State Bar Ass'n.*, 457 U.S. 423, 432–34, 102 S.Ct. 2515, 2521–22, 73 L.Ed.2d 116 (1982) (federal court should have abstained under *Younger* in light of ongoing state disciplinary proceeding of an attorney).

Significantly, the Supreme Court has consistently held that the fact that a litigant cannot initially raise a constitutional claim in the state court proceeding does not prohibit a federal court from abstaining under *Younger*. *See, e.g., Dayton Chris-*

*tian Schools,* 477 U.S. at 629, 106 S.Ct. at 2724 (Although state human rights commission could not consider constitutionality of statute, it was adequate that the federal constitutional claims could be raised in state court review of the administrative proceeding); *Middlesex County Ethics Commission,* 457 U.S. at 435–36, 102 S.Ct. at 2523 (Respondent had "abundant opportunity to present his constitutional challenges in the state disciplinary proceedings" where such issues could be heard by state supreme court). According to the Supreme Court, if a party can raise constitutional claims at some time during the state appellate process, that party's rights are sufficiently protected. *Id.*; *Juidice v. Vail,* 430 U.S. 327, 337, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977) ("Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings."); *Huffman v. Pursue, Ltd.,* 420 U.S. at 609–10, 95 S.Ct. at 1211. The import of those decisions is that "the *Younger* doctrine requires that federal courts abstain when a state proceeding is pending and the state appellate procedure has not been exhausted." *DeSpain v. Johnston,* 731 F.2d 1171, 1177 (5th Cir. 1984). *Younger* abstention is not required though where the state tribunal is incompetent or otherwise unable to resolve the federal constitutional claims at issue. *See, e.g., Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973) (*Younger* abstention improper because State Board of Optometry "incompetent by reason of bias to adjudicate the issues pending before it.") *Gerstein v. Pugh,* 420 U.S. 103, 108 n. 9, 95 S.Ct. 854, 860 n. 9, 43 L.Ed.2d 54 (1975) (District court properly refused to invoke *Younger* abstention where requested injunction not directed at state prosecution; and where constitutional issue of legality of pretrial detention could not be raised in defense of the criminal prosecution).

CECOS, as the federal plaintiff, has the burden here of showing that the state procedure is inadequate in that there is no opportunity to present federal claims. *See Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 1528, 95 L.Ed.2d 1 (1987).

*See generally Middlesex County Ethics,* 457 U.S. at 432, 102 S.Ct. at 2521; *University Club v. City of New York,* 842 F.2d 37, 40 (2d Cir.1988). The Supreme Court instructed in *Pennzoil,* however:

> [w]hen a litigant has not attempted to present his federal claims in related state court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.

*Id.* 107 S.Ct. at 1528. *See also, Trainor v. Hernandez,* 431 U.S. 434, 443, 97 S.Ct. 1911, 1917, 52 L.Ed.2d 486 (1977) (quoting *Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)) (Recognizing that state courts share with federal courts the " 'solemn responsibility' ... to safeguard constitutional rights.")

In *Christ The King Regional High School v. Culvert,* 815 F.2d 219 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987) (*"Culvert"*), the Second Circuit, interpreting *Dayton Christian Schools,* articulated a three-part test for determining the applicability of *Younger* abstention. *Id.* at 224. First, the court must determine "whether there is an ongoing state proceeding." *Id.* Second, the court must consider "whether an important state interest is involved." *Id.* Third, the court must examine "whether the federal plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the proceeding." *Id.* As discussed herein, those three elements are not present here and therefore the court finds that it cannot abstain under *Younger* and its progeny.

Before applying the *Culvert* factors to the present case, there is one other aspect of CECOS' position against *Younger* abstention which the court cannot ignore. CECOS asserts that *Younger* abstention is not mandated here because CECOS is not seeking to "enjoin" a pending state proceeding. In the court's opinion, CECOS places undue emphasis on the fact that it supposedly is not seeking to *enjoin* the state permit proceeding. The Second Circuit recently explained that because *"Younger* itself speaks of 'interference'

with state proceedings," if a litigant is seeking mandatory or prohibitory relief, "the relief he seeks is injunctive in all but name." *Davis v. Lansing*, 851 F.2d 72, 77 (2d Cir.1988).

Here, CECOS is specifically seeking to have this court "preliminarily and permanently *enjoin* defendants, its agents, servants, attorneys, successors, and all persons acting in concert with them from enforcing and applying the new siting law to CECOS." Complaint at p. 9, par. 2 (emphasis added). Given that specific request for injunctive relief, CECOS' assertion that it is not seeking to enjoin the state permit proceeding is utterly without merit. Furthermore, as discussed herein, the posture of the siting board proceeding is such that, at the very least, the requested relief would result in interference with the entire state permit proceeding. And, because such interference is one of the underlying reasons for *Younger* abstention, assuming *arguendo* that the three *Culvert* factors are present, *Younger* abstention would be proper here.

### 1. Ongoing State Proceeding

■ Turning to the first factor enunciated in *Culvert*, although not explicitly stated, CECOS is apparently contending that there is no "ongoing state proceeding," and thus *Younger* abstention is improper. CECOS bases that contention on the fact that in response to the enactment of the new siting law, the DEC suspended the administrative proceeding wherein CECOS was attempting to secure a permit for SCRF number 6. Since that time, however, CECOS has informed the court that the administrative proceeding with respect to that permit application was reopened on March 29, 1988. Letter from Warren S. Radler (February 26, 1988). The court has been further advised that the hearing reconvened on August 2, 1988. Letter from James P. Rigano (July 11, 1988). And although the court receives periodic correspondence from the parties, it has never been advised that the state proceeding is not still pending. Thus, there is no basis for asserting that there is not an "ongoing" state admin-

istrative proceeding within the meaning of *Younger.*

Moreover, the fact that the administrative proceeding here was held in abeyance when this action was filed does not necessarily mean that it was not "ongoing" for purposes of *Younger* abstention. Although not directly on point, *Culvert* is instructive in this regard. In *Culvert*, the Second Circuit held that an ongoing state proceeding existed where the state administrative agency had not yet conducted its formal hearing or imposed any sanctions. *Id.* at 224. Thus, a state proceeding is considered "ongoing" for purposes of *Younger* abstention where it has not been fully completed; and here obviously the state administrative proceeding is not yet complete. The court therefore finds that the requirement of an "ongoing" state proceeding has been satisfied here.

### 2. State Interest

Wisely, CECOS does not dispute that the second prerequisite to *Younger* abstention is present here; that is, the existence of an important state interest. Certainly, as this court has previously recognized, the State of New York has a vital interest in the disposal and transportation of hazardous waste. *See, Onondaga Landfill Systems, Inc. v. Williams*, 624 F.Supp. 25, 30 (N.D. N.Y.1985); *see also, Brookhaven Aggregates, Ltd. v. Williams*, 23 E.R.C. 1927, 1932 (E.D.N.Y.) [1985 WL 6062], *aff'd without decision*, 795 F.2d 78 (2d Cir.1985) (State solid waste disposal scheme is "a matter of ... grave importance to state and local concerns.") Consequently, the court finds that the second part of the *Culvert* test is met in this case.

### 3. Opportunity for Judicial Review

■ The issue of whether the third factor enumerated in *Culvert* is present here is more problematic. CECOS contends that this court should not abstain based upon *Younger* due to the nature of the state proceeding at issue. In particular, CECOS contends that this court should not abstain under *Younger* "because no pending state *judicial* proceedings or administrative proceedings, *judicial in nature*, are being sought to be enjoined."

Plaintiff's Reply Memorandum of Law II at p. 4 (emphasis added).

That contention can be readily dismissed. The New York State ECL expressly provides for an "adjudicatory hearing" to determine whether a siting board certificate should be issued. N.Y.Envtl.Conserv. § 27–1105(3)(e) (McKinney Supp.1989). *Contra Dayton Christian School,* 477 U.S. at 628 n. 2, 106 S.Ct. at 2723 n. 2 ("[I]f state law expressly indicates that the administrative proceedings are not even 'judicial in nature,' abstention may not be appropriate.") Prior to such hearing, the DEC is statutorily required to provide adequate notice to the applicant, as well as to the public at large. *See* N.Y.Envtl.Conserv.Law §§ 27–1105(3)(c) and (e) (McKinney Supp.1989).[8]

In addition to being provided notice, permit applicants such as CECOS are provided with an opportunity to be heard through the adjudicatory hearing process. More particularly, the ECL expressly states that participation in the adjudicatory hearing "may include, but is not limited to, examination of witnesses and requesting the production of documents or witnesses." *Id.* Further the New York Administrative Procedure Act which governs, *inter alia,* siting board proceedings,[9] states that in adju-

dicatory proceedings there "shall [be] findings of fact and conclusions of law or reasons for the [adverse] decision, determination or order." N.Y.A.P.A. § 307(1) (McKinney 1984). Those procedures are mirrored in the DEC regulations, which also govern the siting board proceeding. *See generally,* N.Y.Comp.Codes R. & Regs. tit. 6, § 624 *et seq.*

Finally there is an opportunity for judicial review, but as will be discussed herein, that judicial review is somewhat limited in scope. *See* N.Y.Civ.Prac.L. & R. 7801 et seq. (McKinney 1981). Because the governing statutes and regulations provide for notice and an opportunity to be heard—two features which are typically associated with a judicial proceeding—the court is persuaded that the siting board hearing, which is one part of the entire state permit application process, is judicial in nature. Consequently, CECOS' contention that the court should not abstain because the siting board proceeding is not judicial in nature has no merit.

■ Of equal if not more important concern is whether CECOS has an opportunity for judicial review of its constitutional claim through the state proceeding. The state defendants baldly assert that, "[t]here is no question that the state proce-

8. Section 27–1105(3)(c) states:
Immediately upon determining that an application is complete, the department [DEC] *shall* cause a notice of application to be published in the next available environmental notice bulletin which shall be not later than ten calendar days after the date of such notice and shall provide notice to the chief executive officer of each municipality in which the proposed project is located, and may direct the applicant to provide such reasonable notice and opportunity for comment to the public as the department deems appropriate. Such notice *shall* also be given to all property owners of record within three hundred feet of the subject facility. In addition, notice *shall* be published in at least two newspapers having a general circulation in the area in which the proposed activity is located, and in contiguous areas potentially affected by the proposed action.
N.Y.Envtl.Conserv. § 27–1105(3)(c) (McKinney Supp.1989) (emphasis added). Section 27–1105(3)(e) further provides, in relevant part:
The commissioner of the department of environmental conservation shall appoint a

hearing officer who shall conduct an adjudicatory public hearing upon the application. Such hearing shall commence on or before sixty calendar days after the facility siting board is constituted. *Such hearing shall be preceded by public notice,* in the same form and manner as provided in paragraph (c) of this subdivision, published not less than thirty days prior to such hearing.
N.Y.Envtl.Conserv. § 27–1105(3)(e) (McKinney Supp.1989) (emphasis added).

9. N.Y.Envtl.Conserv. section 27–1105(3)(h) states:
The provisions of article 70 of this chapter *shall* apply to applications pursuant to this title, to the extent such provisions are not inconsistent herewith.
N.Y.Envtl.Conserv. section 27–1105(3)(h) (McKinney Supp.1988) (emphasis added). N.Y. Envtl.Conserv. section 70–0119(5) specifically provides that public hearings thereunder shall be conducted, among other things, as provided in the state administrative procedure act. N.Y. Envtl.Conserv. section 70–0119(5) (McKinney 1984).

dures provide Cecos with an adequate forum under *Younger.* ..." State Defendants' Memorandum of Law at p. 42. CECOS asserts, also without any analysis, that "[n]o procedural mechanism is provided by the pertinent laws for judicial review of the constitutionality of the challenged legislation." Plaintiff's Reply Memorandum of Law II at p. 7. A careful examination of the New York State procedure for review of administrative decisions, such as that which the siting board will ultimately make here, indicates that there is no opportunity for CECOS to raise its constitutional claim in that state scheme.

The accepted method for review of an administrative decision or determination in New York is through a special, unique proceeding, commonly referred to as an Article 78 proceeding. N.Y.Civ.Prac.L. & R. 7801 sets forth the circumstances under which an Article 78 proceeding is properly brought. Section 7801 states, in part:

> Relief previously obtained by writs of certiorari to review, mandamus or prohibition shall be obtained in a proceeding under this article. Wherever in any statute reference is made to a writ or order of certiorari, mandamus or prohibition, such reference shall, so far as applicable, be deemed to refer to the proceeding authorized by this article.

N.Y.Civ.Prac.L. & R. 7801 (McKinney 1981). Article 78 proceedings may be used when a litigant mounts a constitutional challenge to the application of a statute. *See e.g., Bd. of Educ. v. Gootnick*, 49 N.Y. 2d 683, 687, 427 N.Y.S.2d 777, 778, 404 N.E.2d 1318, 1319 (1980); *R & G Outfitters, Inc. v. Bouchard*, 101 A.D.2d 642, 475 N.Y.S.2d 549 (3rd Dep't 1984); *Top Tile Bldg. Supply Corp. v. N.Y. State Tax Comm'n*, 94 A.D.2d 885, 463 N.Y.S.2d 558 (3rd Dep't 1983). Therefore, the Second Circuit in *University Club v. City of New York*, 842 F.2d 37 (1988), concluded that *Younger* abstention was mandated, in part because the constitutional claims at issue were "as-applied" challenges to a statute and not "facial" challenges. *Id.* at 40.

It is well settled in New York though that "constitutional challenges to legisla-

tive enactments may *not* be raised in an Article 78 proceeding to review an administrative action...." *Id.* at 40 (citation omitted) (emphasis added). Such challenges are more appropriately brought in a declaratory judgment action. *See Matter of Merced v. Fisher*, 38 N.Y.2d 557, 381 N.Y.S.2d 817, 345 N.E.2d 288 (1976); *Kovarsky v. Housing Development Administration*, 31 N.Y.2d 184, 191–92, 335 N.Y.S.2d 383, 387–88, 286 N.E.2d 882, 885 (1972). According to one commentator, the reason for that distinction is:

> When the attack is upon the essential validity of the statute, a question of law is presented and no particular record need be developed. Accordingly, an action for declaratory judgment lies. On the other hand, when the basis of the attack is that the statute has been unconstitutionally applied to the petitioner, an appropriate factual record must be developed which can then be reviewed in an Article 78 proceeding in the nature of either certiorari or mandamus.

N.Y.Civ.Prac.L. & R. C7801:6 (McKinney 1981).

Applying those rules to the present case, the court is convinced that CECOS would not have an opportunity to raise its constitutional claims in the state proceeding. Even though CECOS' complaint is framed, in part, in terms of an "as applied" challenge, after reading the entire complaint, the memorandums of law submitted on behalf of CECOS, and after hearing oral argument, it appears to the court that the "as applied" language was simply a matter of inartful pleading. CECOS' constitutional claims actually amount to a facial challenge to the new siting law. In fact, in its second reply memorandum of law CECOS expressly argued, "[t]he DEC does not have the power to review the facial constitutionality of a State statute." Plaintiff's Reply Memorandum of Law II at p. 8. This is *not* a situation where the litigant is claiming that a statute was unconstitutionally applied to him. *See, e.g., Brookhaven Aggregates Ltd. v. Williams*, 23 E.R.C. 1927, 1929 (E.D.N.Y.), *aff'd without opinion*, 795 F.2d 78 (2d Cir.1985) ("Plaintiff further alleges that defendants sued and misapplied the

applicable state statutes in order to effectuate this result.") Nor is this a situation where a party is claiming that an administrative agency lacked authority to act. *See, e.g., Culvert,* 815 F.2d at 224, (*Younger* abstention proper because, among other reasons, the federal plaintiff could have raised its constitutional challenge to the jurisdiction of the State Labor Relations Board both before that Board and in an Article 78 proceeding).

Instead, CECOS is arguing that the new siting law is unconstitutional because it applies only to CECOS and to one other hazardous waste landfill disposal facility in New York; that argument pertains directly to the new siting law itself. In fact, at paragraph 28 of the complaint, CECOS alleges:

> The statutory scheme set forth in the new siting law is patently discriminatory, singles out CECOS for discriminatory treatment without a rational basis, and denies CECOS equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

The plain meaning of that allegation is that CECOS is attacking the constitutionality of the new siting law on its face. Thus, because the court finds that CECOS cannot challenge the constitutionality of the new siting law on its face in an Article 78 proceeding, the court concludes that CECOS does not have a full and fair opportunity for judicial review of such claim, which is a necessary predicate to *Younger* abstention. Accordingly, because all three of the *Culvert* factors are not present here, the court cannot and will not abstain under *Younger* and its progeny.

### C. Burford Abstention

■ The policy underlying *Burford* abstention is that federal courts should abstain from interfering with specialized, ongoing state regulatory schemes. That policy is based upon the "federalist principle of comity between state and federal sovereignties." *Canady v. Koch,* 608 F.Supp. 1460, 1468 (S.D.N.Y.), *aff'd,* 768 F.2d 501 (2d Cir.1985). In other words, the focus of *Burford* abstention is on promoting feder-

al-state relations. *Corcoran v. Ardra Insurance Co., Ltd.,* 657 F.Supp. 1223, 1230 (S.D.N.Y.1987). In *Colorado River,* the Supreme Court reiterated the circumstances under which *Burford* abstention is proper:

> [This type of a]bstention is ... appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar.... In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244 (citations omitted). In determining whether to invoke *Burford* abstention, the Second Circuit has outlined three factors to be considered. The first factor is whether the order, statute, regulation or provision being challenged in federal court is "part of a unified regulatory scheme on a complex subject matter of special state interest, a scheme in which the state administrative agency and the state courts cooperated closely to safeguard the values of uniformity, expertise and due process...." *Law Enforcement Insurance Co. Ltd. v. Corcoran,* 807 F.2d 38, 43 (2d Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). The second factor is whether "the state ha[s] expressed its interest in unified decision making by creating a system on the state level to avoid multiple inconsistent adjudications, a system that would be disrupted by the exercise of jurisdiction by the federal courts...." *Id.* The third factor is whether "the issues sought to be adjudicated in federal court [are] largely ones of state law." *Id.* Application of those factors to the unique facts of this case mandates the conclusion that it is not appropriate for this court to abstain under *Burford.*

The new siting law, which CECOS is challenging, clearly involves state regula-

tion of land use—a quintessential *Burford* type activity. The new siting law is plainly part of New York State's unified, extensive regulatory scheme for overseeing the disposal and transportation of hazardous chemical waste, and CECOS does not contend otherwise. *See, e.g.,* ECL Article 27, tit. 9 (McKinney 1984 & Supp.1988) ("Industrial Hazardous Waste Management"); ECL Article 27, tit. 11 ("Industrial Siting Hazardous Waste Facilities"); 6 N.Y.Comp. Codes R. & Regs. tit. 6, §§ 370–375 (1987) (regulations pertaining to hazardous waste management). Therefore, the first *Burford* factor is present in this case.

The second *Burford* factor is not present however. In *Burford,* the Texas Railroad Commission granted Burford permission to drill several oil wells and issued a permit in accordance with that decision. The plaintiff, Sun Oil Company, then commenced an action in federal court to challenge the reasonableness of the Commission's decision. In determining that the district court should have dismissed the complaint on abstention grounds, the Supreme Court reasoned that the state had created a complex review system whereby aggrieved parties, such as the plaintiff, could challenge the issuance of permits. The Court further reasoned that in light of that comprehensive review system established by the state, federal court intervention would have "an impermissibly disruptive effect on state policy for the management of those fields." *Colorado River,* 424 U.S. at 815, 96 S.Ct. at 1245.

The present case stands in marked contrast to the situation in *Burford.* Although certain DEC decisions made regarding hazardous waste are reviewable,[10] there are no mechanisms incorporated within New York State's statutory scheme whereby operators of hazardous waste management facilities, such as CECOS, can challenge the constitutionality of a given statute or regulation on its face. Therefore, contrary to the state defendants' unsupported assertion, any decision by this court would not have a disruptive effect on state policy; and more specifically on the state administrative proceedings. This is *not* a case where in exercising its jurisdiction this court would risk rendering a decision that would be incompatible with a decision made within the state review system. *Accord, Long Island Lighting Co. v. Cuomo,* 666 F.Supp. 370, 399 (N.D.N.Y.1987) (emphasis in original) ("Resolution of LILCO's claims will not threaten the uniform *application* of any regulatory scheme by creating potentially inconsistent interpretations of those regulations, nor do the issues raised in LILCO's Complaint require special expertise beyond the province of this court.") Thus, the risk of multiple inconsistent judgments—the second *Burford* factor—has not been shown here.

Nor is the third *Burford* factor implicated by the facts of this case. Succinctly stated, the issue presented is whether the new siting law deprives CECOS of equal protection and due process, as guaranteed to it under the fourteenth amendment to the United States Constitution.[11] The state defendants attempt to establish the third *Burford* factor by asserting that there are state law issues raised by CECOS' complaint. In particular, the state defendants contend that the following "state law questions" must be decided in conjunction with CECOS' constitutional claim:

[T]he intent of the statute, the availability of adequate hearing and review procedures, the application of the "environmental safety and public necessity" standard by the siting board, the asserted redundancy of the DEC and siting board determinations, and the possible preclu-

---

**10.** For example, an Article 78 proceeding would be available to a party claiming to be aggrieved by a decision made by the DEC pursuant to a given statute.

**11.** Although in its complaint CECOS also asserted that the new siting law constitutes a taking without just compensation in violation of the fifth and fourteenth amendments of the United States Constitution, complaint at par. 30, at oral

argument CECOS conceded that this is not a taking case; and, in fact, at that time CECOS specifically stated that the thrust of this action is an alleged denial of equal protection. CECOS reiterated that position in its reply memorandum of law II, when it stated, "[t]he essence of CECOS' claim is based on due process, not a fifth amendment taking claim." *Id.* at p. 13.

sive effect of a favorable determination by DEC upon later proceedings before the siting board.

State Defendants' Memorandum of Law at p. 39–40 n. 23. In the court's opinion, those issues are not uniquely matters of state law; rather they are part and parcel of CECOS' federal constitutional claim. It is the federal issue which is dominant here, and consequently abstention is not sanctioned. *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. at 399 (and cases cited therein).

Recently the Second Circuit had occasion to review the circumstances under which a district court should invoke *Burford* abstention, and that decision provides additional authority for this court's decision not to abstain under *Burford*. In *Alliance of American Insurers v. Cuomo*, 854 F.2d 591 (2d Cir.1988), the plaintiffs were a group of insurance associations, insurance companies, and policy holders who were challenging two provisions of the New York Medical and Dental Malpractice and Professional Conduct Act of 1986 ("1986 Act"). Specifically, those plaintiffs were challenging the constitutionality of a state statute, which removed the New York Superintendent of Insurance's power to liquidate or rehabilitate insolvent insurers.

The district court in *Alliance* invoked several abstention doctrines, including *Burford*. After carefully analyzing the facts, the Second Circuit concluded that the district court improperly relied upon *Burford* to abstain. There were several reasons for that conclusion. First, the Court noted that "there [was] no danger of interrupting the course of the state's comprehensive insurance scheme...." *Id.* at 601. The Court further reasoned:

> [T]he complaint here involves the unconstitutionality of a state statute on due process and taking grounds under the United States Constitution, rather than the acts of the Superintendent under state law. There are no factual determinations of state agencies or courts at issue in this case. This case is a direct challenge to the constitutionality of a state statute, a controversy federal courts are particularly suited to adjudicate.

*Id.* Finally the Court soundly explained:

> There is no ambiguous state law issue. Specific channels of judicial review under state law are irrelevant to consideration of this federal question. There is no attempt to avoid any prior state court or agency determination. This case does not involve federal courts in supervising, interrupting, or meddling in state policies by interfering in state regulatory matters. While the resolution of this case could have a broad impact on important state policy, 'there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy.' ... The fact that sections 8 and 40 of the 1986 Act may be part of a coherent state regulatory system does not diminish the gravity or the complexion of the federal constitutional challenge plaintiffs make. 'The state has no right to an unconstitutional policy, coherent or otherwise.'

*Id.* (citations omitted).

As previously discussed, as in *Alliance*, this action involves a "direct challenge" to the constitutionality of the new siting law. Any decision by this court will not intrude upon the DEC or the state courts because those entities have not made any factual findings which are in dispute here. Additionally, also as in *Alliance*, CECOS is not seeking to avoid a prior state court or agency determination. Lastly, even though resolution of CECOS' constitutional challenge could potentially have far reaching implications for the way in which New York State manages its hazardous waste, as the Second Circuit emphasized in *Alliance*, that impact is insufficient to justify abstaining.

In an attempt to convince this court that *Burford* abstention governs this action, the state defendants point to *Macaluso v. New York State Department of Environmental Conservation*, No. 86 CV 2373, slip op. (E.D.N.Y. April 24, 1987) [1987 WL 10840], wherein the court abstained based upon *Burford* from hearing a challenge to New

York's Freshwater Wetlands Act. In *Macaluso*, the plaintiff property owners obtained a permit from the City of New York to build a hotel and parking lot on their property. After inquiring, plaintiffs were told by the DEC that the property had been tentatively mapped as wetlands; and construction was subsequently stopped. Plaintiffs then commenced a lawsuit against several state and city defendants alleging claims predicated on both state and federal law. The thrust of plaintiffs' state law claims was that the state defendants failed to comply with the State Freshwater Wetlands Act. Plaintiffs also alleged constitutional claims based upon an alleged taking without just compensation and upon an alleged violation of their due process rights.

The state defendants urge this court to follow Judge McLaughlin's reasoning here. The state defendants are ignoring two fundamental distinctions between *Macaluso* and the present case, however. The first important distinction is based upon the procedural posture of that case. In *Macaluso* no final map had been issued by the DEC with respect to the wetland status of plaintiffs' property. Therefore, Judge McLaughlin reasoned that *Burford* abstention was appropriate because plaintiffs could "avail themselves of the Act's [Freshwater Wetlands Act] procedures in order to reverse the Commissioner's tentative designation." *Id.* Given the availability of those administrative procedures, the court concluded, "Federal judicial review at this point would thus be intrusive and disruptive, and possibly unwarranted." *Id.*

Here, because there is no procedure whereby CECOS can raise a facial constitutional challenge to the new siting law, the policy concern of interfering with a state administrative proceeding, which was present in *Macaluso*, is conspicuously absent. There is no danger that any decision by this court would disrupt or interfere with the state permit proceeding. Depending upon the outcome of this litigation, the only impact this court's decision will have on the state administrative process is to simply shorten or lengthen it.

Secondly, unlike *Macaluso*, the new siting law does not "present[ ] many difficult questions of state law." *Id.* As already noted, the sole issue before this court is a federal one: whether the new siting law violates CECOS' constitutional right to equal protection and due process, as guaranteed by the fourteenth amendment of the United States Constitution. Thus, because of those significant factual distinctions, the court finds *Macaluso* inapposite.

The state defendants' reliance upon *Brookhaven Aggregates Ltd. v. Williams*, 23 E.R.C. 1927 (E.D.N.Y.), *aff'd without opinion*, 795 F.2d 78 (2d Cir.1985), is also misplaced. In *Brookhaven*, plaintiff contended that the state defendants used and misapplied state statutes pertaining to landfill operations when they ordered plaintiff to shut down its landfill operation due to alleged groundwater contamination at the site. In determining that abstention was proper, the court noted that "the plaintiff's challenge of the defendants' conduct is inextricably bound with an interpretation of the state statutes allegedly 'used and misapplied' by the defendants." *Id.* at 1931. The court was also persuaded by the fact that the summary abatement statute being challenged was part of the state's "complex regulatory scheme for the operation of landfills in Nassau and Suffolk Counties," which had not been interpreted by a state court. *Id.* at 1932. Finally, the court emphasized the propriety of abstention due to the fact that plaintiff also had pending state court actions.

Like *Macaluso*, *Brookhaven* is also readily distinguishable on its facts. CECOS is not contending, as did Brookhaven, that the state defendants are misapplying the new siting law; rather, CECOS is simply contending that the new siting law is unconstitutional on its face. In addition, in contrast to the present case, Brookhaven was *not* challenging the constitutionality of the pertinent state statutes. *Id.* at 1930. Another significant difference between *Brookhaven* and this case is that in the former plaintiff had several pending state court actions; whereas there are no pending state court actions here. The possibility of inconsistent judgments is therefore

nonexistent in the present case. That is especially so in light of the fact that there are no administrative means available to CECOS to seek the relief which it is seeking in this court. In addition to those obvious factual distinctions, the court also finds that *Brookhaven* is of limited precedential value here because the court addressed *Burford* abstention in dicta, with little or no analysis. Thus, the court concludes that *Brookhaven* is inapposite.

Another case relied upon by the state defendants cannot go without comment in that it is a prior decision of this court. This court abstained, in part, on the basis of *Burford* in *Onondaga Landfill Systems, Inc. v. Williams*, 624 F.Supp. 25 (N.D.N.Y.1985). A primary reason for abstaining there was the existence of an ongoing state court proceeding combined with the fact that the plaintiffs there could raise their constitutional claims before the state court judge in the pending state action.

*Onondaga Landfill* differs from the present action in three important aspects. First, the concern for conflict between the state and federal courts is missing here. Unlike *Onondaga Landfill*, as previously discussed, any decision by this court will not interfere and potentially conflict with an ongoing state proceeding. Second, as also previously discussed, CECOS does not have a state forum available to it in which to have its constitutional claim heard. Third, in *Onondaga Landfill* this court abstained primarily on the basis of *Younger* and it simply noted that "elements of *Burford* abstention [were] present." *Id.* at 33. Therefore, the court is not compelled to follow its prior decision in *Onondaga Landfill*.

In conclusion, because all three elements necessary to abstain under *Burford* have not been established here, the court determines that it is not necessary or proper for it to abstain based upon *Burford*.

## II. Eleventh Amendment

Having determined that abstention is not mandated in this case, the court must next consider the state defendants' assertion that this action is barred by the eleventh amendment. The eleventh amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has stated that the underlying purpose of the eleventh amendment is "its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III" of the United States Constitution. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*). Even though the eleventh amendment only expressly proscribes suits by citizens of other states, it is well settled that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Employees v. Missouri Public Health Dep't*, 411 U.S. 279, 280, 93 S.Ct. 1614, 1615–16, 36 L.Ed.2d 251 (1973); *Hans v. Louisiana*, 34 U.S. (9 Pet.) 1, 9 L.Ed. 29 (1835). As with most rules, there are exceptions. For example, the eleventh amendment is not a bar to an action where the state has waived its sovereign immunity and consented to be sued in federal court. *Welch v. State Dep't of Highways and Public Transp.*, 483 U.S. 468, 107 S.Ct. 2941, 2945, 97 L.Ed.2d 389 (1987) (citation omitted). In addition, if a state has not expressly waived its sovereign immunity, Congress may abrogate the eleventh amendment by acting to enforce the fourteenth amendment pursuant to its power under section five of that amendment. *See, Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (citation omitted). ("We think that Congress may, ..., provide for private suits against States or State officials which are constitutionally impermissible in other contexts.") In the absence of an express waiver by the state, or Congressional override, however, the eleventh amendment

clearly bans actions "in which the State or one of its agencies or departments is named." *Pennhurst II,* 465 U.S. at 100, 104 S.Ct. at 908 (citations omitted). That is true "regardless of the nature of the relief sought." *Id.*

Although the eleventh amendment is a bar to suits for monetary damages out of state funds, *see, e.g., Edleman,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, it has long been established that the eleventh amendment does not forbid federal courts from granting injunctive relief against a state official acting contrary to the United States Constitution. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Federal courts are vested with that authority to vindicate "the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454. *Accord, Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that [federal] law.") The eleventh amendment can nonetheless bar an action against a state official if the state is the 'real, substantial party in interest.' *Pennhurst II,* 465 U.S. at 101, 104 S.Ct. at 908 (citations omitted). As the state defendants correctly declared, "[t]he general rule is that relief sought against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* (citation omitted) A judicial decree "operates" against the state if " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the government from acting, or to compel it to act.' " *Id.* at 101, n. 11, 104 S.Ct. at 908, n. 11 (*quoting Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963)).

■ Applying those eleventh amendment principles to the present case, it is clear that the eleventh amendment is a jurisdictional bar to CECOS' action against the New York State DEC, an agency of the State of New York. CECOS has not pointed to any legal authority, and the court is not aware of any, indicating that New York has expressly waived its sovereign immunity with respect to actions against the DEC. Nor is this a situation where Congress has chosen to exercise its power to enforce the fourteenth amendment, and abrogated the eleventh amendment with respect to the New York State DEC. Consequently, the court finds that, as a matter of law, the eleventh amendment prohibits CECOS from pursuing this action against the New York State DEC. Accordingly, the state defendants' cross-motion for summary judgment must be granted in this respect and CECOS' complaint is dismissed insofar as it states a cause of action against the New York State DEC.

■ On the other hand, CECOS' action against Thomas Jorling, as Commissioner of the New York State DEC, is not proscribed by the eleventh amendment. While it is true, as the state defendants pointed out, that the eleventh amendment prohibits actions against state officials where the judgment would have the effect of "restrain[ing] the Government from acting, or ... compel[ing] it to act," *Pennhurst II,* 465 U.S. at 101, n. 11, 104 S.Ct. at 908, n. 11, there is a significant exception. As previously mentioned under *Ex parte Young,* "a suit challenging the constitutionality of a State official's action is not one against the State." *Pennhurst II,* 465 U.S. at 102, 104 S.Ct. at 909.

In *Ex parte Young,* the court enjoined the State Attorney General from bringing an action to enforce a state statute, which allegedly violated the fourteenth amendment. The Supreme Court held that the eleventh amendment did not bar the issuance of that injunction. The Court in *Ex parte Young* reasoned that an unconstitutional statute is "void," and thus it does not "impart to [the officer] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454. The Supreme Court further reasoned that because the state could not authorize the action, the state official was "stripped of his official or representative character and [was] subjected in his person to the

consequences of his individual conduct." *Id.*

As the Supreme Court has noted, courts have not expansively interpreted the *Ex parte Young* exception to the eleventh amendment. *Pennhurst II,* 465 U.S. at 102, 104 S.Ct. at 909. Recognizing the limited application of the *Ex parte Young* exception, the court, nevertheless, concludes that the present case undoubtedly falls within that exception. Here, CECOS is clearly seeking to challenge the constitutionality of a state official's action, by seeking to enjoin the DEC Commissioner from enforcing the new siting law, which CECOS claims is unconstitutional. Specifically, CECO's complaint alleges, in pertinent part:

> That the Court declare that the new siting law, as applied to CECOS, violates the Due Process clause of the Fourteenth Amendment to the United States Constitution, denies CECOS equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution, and constituted a taking without just compensation in violation of the Fifth and Fourteenth amendments to the United States Constitution.

> That the Court preliminarily and permanently enjoin defendants, its agents, servants, attorneys, successors, and all persons acting in concert with them from enforcing and applying the new siting law to CECOS.

Complaint at p. 9, pars. 1–2. Further, CE-COS has withdrawn its claim for monetary damages and for declaratory judgment. *See* CECO's Reply Memorandum of Law II at p. 2, n. 1 and letter of Warren S. Radler (September 25, 1987). Thus, because CE-COS now seeks only prospective injunctive relief, the eleventh amendment does not prevent this court from granting such relief.

██ In so holding, the court expressly rejects the state defendants' contention that the *Ex parte Young* exception does not apply here "because the complaint does not assert a constitutional claim." State Defendants' Reply Memorandum of Law at p. 12. The state defendants misconstrue the proper inquiry under *Ex parte Young.* In determining whether the *Ex parte Young* exception applies, the issue is not whether a plaintiff will ultimately prevail on his claim that state officials are acting in violation of federal law. Instead the focus is on whether the complaint is seeking to enjoin a state official from enforcing a state statute, which "allegedly" violates federal law; *Pennhurst II,* 465 U.S. at 102, 104 S.Ct. at 909; and that is precisely what CECOS has alleged in this action. Thus, the court holds that the eleventh amendment is not a defense to CECOS' action seeking prospective injunctive relief against the New York State DEC Commissioner, Thomas Jorling.

## III.  Equal Protection

██ In its complaint CECOS raises several constitutional challenges to the new siting law; but as it acknowledged at oral argument, the most significant challenge is based upon the equal protection clause of the fourteenth amendment. The fourteenth amendment states, in part, that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The purpose of that clause is to assure that "all persons similarly situated [are] treated alike." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

Through the years several concrete principles have emerged which are the cornerstone of the Supreme Court's equal protection jurisprudence. Recently, the Supreme Court reiterated the well settled general rule which is the starting point for any equal protection analysis. Specifically, in *Bankers Life & Casualty Co. v. Crenshaw,* — U.S. ——, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988), the Court stated that a state statute is 'presumed to be valid and will be sustained if the classification ... is rationally related to a legitimate state interest.' *Id.* at ——, 108 S.Ct. at 1652 (quoting *Cleburne,* 473 U.S. at 440, 105 S.Ct. at

3254).[12] Further, in the context of social or economic legislation, the Supreme Court has repeatedly recognized that, "the Equal Protection Clause allows the States wide latitude, ..., and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. *See also, Dieffenbach v. Attorney General of Vermont,* 604 F.2d 187, 195 (2d Cir.1979) (quoting *Allied Stores v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 443, 3 L.Ed.2d 480 (1959)) ("In an economic matter ..., we owe an extraordinary deference to state objectives, almost the equivalent of a strong presumption of constitutionality, and we must uphold any classification based 'upon a state of facts that reasonably can be conceived to constitute a distinction, or difference in state policy.' ") Consequently, social and economic legislation, such as the new siting law being challenged herein, "carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). In light of that heavy presumption, the burden is on the party challenging a statute's constitutionality to " 'convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " *New York State Club Assn v. New York City,* — U.S. —, —, 108 S.Ct. 2225, 2236, 101 L.Ed.2d 1 (1988) (quoting *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979)). Accordingly, when undertaking an equal protection analysis, a court is "not bound by explanations of the statute's rationality that may be offered by litigants or other courts." *Kadrmas v. Dickinson Public Schools,* — U.S. —, — – —, 108 S.Ct. 2481, 2489–90, 101 L.Ed.2d 399 (1988). This court's concern then should be with whether CECOS, as the party challenging the state statute, has met its strict burden of persuasion.[13]

It is with those guiding principles in mind that the court considers CECOS' equal protection argument. CECOS, as the party challenging the constitutionality of the new siting law, must demonstrate that the legislative classification between commercial and non-commercial hazardous

---

**12.** There are several exceptions to the rational relationship rule, which obviously are not applicable here. For example, that rule does not apply when the statutory classification is based upon race, alienage or national origin, or when the state statute infringes upon constitutionally protected personal rights. *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Under those circumstances, strict scrutiny of the questionable legislation is required, and such statutes will be upheld "only if they are suitably tailored to serve a compelling state interest." *Id.* The rational relationship standard is also not applicable when the legislative classification is based upon gender. Then the test is whether such classification is "substantially related to a sufficiently important governmental interest." *Id.* at 441, 105 S.Ct. at 3255.

**13.** The court is well aware of the somewhat novel approach to equal protection analysis taken by the court in *Long Island Lighting Co. v. Cuomo,* ("*LILCO*"), 666 F.Supp. at 409–425, which CECOS urges this court to follow. After a thorough discussion of the evolution of equal protection analysis by the Supreme Court, Judge Munson concluded:

> [I]t does not seem that the courts would unduly hinder the political branch by placing the *initial burden* of articulating a legitimate governmental interest served by a challenged

classification *on the party defending the classification.*

*Id.* at 421 (emphasis added).

Recent decisions of the Supreme Court make clear, however, that the burden shifting advocated by the court in *LILCO* is not proper. In *New York State Club Ass'n,* for example, the Supreme Court expressly stated:

> Legislative classifications, however, are presumed to be constitutional, and the burden of showing a statute to be unconstitutional is on the challenging party, *not* on the party defending the statute:....

*Id.* — U.S. at —, 108 S.Ct. at 2236 (emphasis in original). Likewise, in *Kadrmas v. Dickinson Public Schools,* the Supreme Court reiterated the established rule that:

> Social and economic legislation ..., 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.'

*Id.* — U.S. at —, 108 S.Ct. at 2484 (quoting *Hodel v. Indiana,* 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981)). This court cannot ignore those clear pronouncements by the Supreme Court; and thus it declines to follow the approach taken by the court in *LILCO.*

waste facilities [14] is not rationally related to any legitimate, governmental purpose law. In that respect, CECOS has the "considerable" burden of showing "that the asserted grounds for the legislative classification lack any reasonable support in fact ...;" and that it cannot do. *New York State Club Ass'n*, —— U.S. at ——, 108 S.Ct. at 2236 (citing *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)).

Although not obligated to do so, defendants offer several "legislative facts on which the classification is apparently based," which the court finds compelling. First, due to the character of commercial hazardous waste facilities, they are more predisposed to expansion than non-commercial facilities. That is so because non-commercial facilities are generally located on the sites of plants which, in the course of their business operations, generate hazardous waste. Obviously such facilities do not have the same profit motive to expand as do commercial facilities, which are almost exclusively motivated by profit. Because of the distinct profit motive, commercial facilities have an obvious interest in seeking to expand their facilities as much as is economically and physically feasible.

In addition to the tendency towards growth, another relevant feature of commercial facilities is that hazardous waste must be transported to those facilities; whereas transportation is not required with non-commercial facilities because the hazardous waste is generated and disposed of directly on-site. There are plainly risks associated with the transportation of hazardous waste, as is evidenced by the heavily regulated nature of that industry. *See, e.g.*, 42 U.S.C. § 6923 (West 1983 & Supp. 1988) ("Standards applicable to transport-

ers of hazardous waste"); 49 U.S.C.App. §§ 1801–1813, Hazardous Materials Transportation Act (West 1976 & Supp.1989); N.Y.Envtl.Conserv. § 27–0909 (McKinney 1984 & Supp.1989) ("Standards applicable to transporters of hazardous waste"); N.Y. Comp.Codes R. & Regs. tit. 6, § 372. Given the economically motivated orientation toward expansion and the fact that hazardous waste must be transported to the commercial facilities, it appears to the court that there is a rational relationship between requiring siting board review of proposed expansion of commercial hazardous waste facilities and the state's legitimate interest in assuring the "adequate and sound" disposal of hazardous waste. Furthermore, CECOS has not met its burden of establishing that those asserted grounds "lack any reasonable support in fact." In the absence of such a showing, CECOS' equal protection challenge must fail.

An additional explanation for requiring siting board certificates for commercial facilities, but not for non-commercial ones, is that commercial facilities usually accept hazardous waste generated in other parts of the state. Non-commercial facilities, on the other hand, do not accept hazardous waste generated elsewhere. Therefore, perhaps one purpose of the new siting law was to help insure that a given part of the state does not receive a disproportionately large share of the state's hazardous waste. That rationale is consistent with the ECL statutory scheme wherein the DEC is predominantly concerned with the scientific and engineering aspects of hazardous waste management; whereas the siting board is primarily concerned with the "public necessity" of expansion—an issue not directly before the DEC. *Compare* N.Y.

---

**14.** The state defendants strenuously assert that the new siting law does not distinguish between "commercial" and "non-commercial" hazardous waste facilities. Rather, it is the state defendants' position that the new siting law does apply to non-commercial facilities "as that term is used by Cecos." State Defendants' Memorandum of Law at p. 12. It appears to the court, however, that the state defendants' assertion that there is no statutory distinction between commercial and non-commercial facilities is simply a matter of semantics. The new siting law does create a distinction between those seeking to expand hazardous waste facilities generating such waste on site and disposing of it in a certain manner on-site and those facilities which do *not* engage in on-site generation and disposal of hazardous waste. While recognizing that there may be other types of non-commercial and commercial hazardous waste facilities, this court will consider the former as "non-commercial" facilities and the latter as "commercial" facilities for purposes of analyzing the new siting law.

Envtl.Conserv. § 27–1103(2)(a)–(h) (McKinney Supp.1989) *with* N.Y.Comp.Codes R. & Regs. tit. 6, § 361 (1982).

The court finds two other possibilities offered by the state defendants equally plausible. The first is that the legislature simply determined that given the serious implications of expanding hazardous waste facilities, two independent bodies (the DEC and the siting board) should evaluate the necessity for such expansion. The second possibility is that the legislature may have decided to proceed one step at a time insofar as requiring siting board certifications is concerned; and it is well settled that such an approach is not constitutionally impermissible. *See, City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 2517–18, 49 L.Ed.2d 511 (and cases quoted therein). Given the difference between commercial and non-commercial facilities previously discussed, the legislature could have reasonably concluded that commercial facilities should be the first facilities subject to siting board review. Then, as more resources become available, the legislature may well determine that siting board certification should be required of other types of hazardous waste facilities as well.

In the court's opinion all of those justifications appear to be rationally related to the clear, legitimate stated purpose of this legislation, of which the challenged new siting law is a part. In particular, as the legislative findings make clear, there were two primary reasons for the enactment of this legislation. The first was:

> [t]o reduce or, where possible, eliminate environmental risks posed by the generation, storage, transportation, treatment and disposal of hazardous waste through ... a dedicated effort to reduce and recycle wastes where possible....

N.Y.Laws 1987, Ch. 618, § 1. The second underlying purpose was to assure "adequate and sound disposal capacity for wastes which cannot be eliminated or recycled." *Id.* And, all of the explanations proffered by the defendants advance those express purposes.

CECOS makes several arguments as to why the new siting law is not rationally related to the stated environmental purpose of assuring the safe and sound disposal of hazardous waste; but it has failed, as it must, to persuade the court that the asserted grounds for the legislative classification lack any reasonable support in fact. Nor has CECOS convinced the court that the new siting law is arbitrary and irrational.

CECOS contends that the new siting law will encourage the expansion and proliferation of non-commercial facilities, which presently are not required to obtain siting board approval. There is absolutely no evidence in the record as it is now constituted, however, to support that bald assertion; and as previously outlined the burden is on the party attacking the legislative classification to show that the alleged basis for the distinction "lacks any support in fact." Moreover, as the state defendants point out, the statutory exception for non-commercial facilities will undoubtedly encourage hazardous waste generators to detoxify and dispose of the waste on site; thus eliminating the risks inherent in transporting hazardous waste. Therefore, even if the end result of the new siting law is an increase in the number of non-commercial facilities within the state, the court is not satisfied that the result necessarily means the new siting law is irrational.

CECOS also contends that the new siting law cannot pass constitutional muster because the standards of obtaining a siting board certificate are the same as those already considered in CECOS' Draft Supplemental Environmental Impact Statement and its permit application. In the court's opinion though that purported duplication does not mandate the conclusion that the new siting law is arbitrary and irrational. As the state defendants posited, it may well be that the legislature simply determined that given the serious implications of expanding hazardous waste facilities, two independent bodies (the DEC and the siting board) should evaluate the necessity for such expansion; and that seems entirely rational to the court.

CECOS does make one argument which on its face is somewhat persuasive. Specifically, CECOS contends that one effect of

the new siting law would be to require hazardous waste generators that do not have secure landfills to transport their waste even farther to out-of-state landfills. Even assuming the validity of that assertion, because CECOS did not offer any proof to support that allegation, it has not satisfied the court that "the asserted ground for the legislative classification lacks any support in fact." In conclusion, CECOS has simply failed to meet its burden of showing that the legislative classification requiring siting board approval for commercial but not for non-commercial facilities lacks *any* reasonable support in fact. The court therefore concludes that the new siting law is not violative of CECOS' equal protection rights. Thus, defendants' cross-motion for summary judgment is granted and CECOS' motion for summary judgment is denied with respect to this issue.

## IV. Due Process Claim

There are two aspects to CECOS' due process argument. The first is that the new siting law "goes too far," and thus is tantamount to a taking violative of the fourteenth amendment due process clause. Relying upon *LILCO*, 666 F.Supp. at 397, CECOS maintains that the remedy for that alleged abuse of the state's police power is to invalidate the new siting law. CECOS' second due process argument is that the new siting law represents an "abuse" of the State's police power. More specifically, CECOS contends that when the state enacted the new siting law after CECOS had already completed a significant portion of the permit proceeding, the state "forced CECOS to go back to 'square one,'" thereby allegedly "depriving CECOS of its vested property rights and of a prompt and meaningful review of its permit application." Plaintiff's Memorandum of Law at p. 22. The court will address each of those arguments in turn.

### A. Exercise of State's Police Power

■ In response to CECOS' contention that the new siting law violates due process because it goes "too far," the state defendants assert, *inter alia*, that such a claim

is not yet ripe; and the court agrees. In *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), some developers were challenging a county zoning ordinance which they claim went "too far" in violation of the fourteenth amendment because it denied them "economically viable" use of their property. The Supreme Court did not squarely address the developer's theory that the county zoning ordinance went "too far" because it held that such an argument was premature. In so doing the Court explained:

> Viewing a regulation that 'goes too far' as an invalid exercise of the police power, rather than as a 'taking' for which just compensation must be paid, does not resolve the difficult problem of how to define 'too far,' that is, how to distinguish the point at which regulation becomes so onerous that it has the same effect an as appropriation of the property through eminent domain or physical possession. As we have noted, resolution of that question depends, in significant part, upon an analysis of the effect of the Commission's application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectations. That effect cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property.

*Id.* at 199–20, 105 S.Ct. at 3123–24 (footnote omitted). Relying upon that same reasoning, Judge Munson in *LILCO* also rejected aa premature LILCO's theory that the Used and Useful Act at issue therein went "too far" so as to amount to a "taking" in violation of the due process. *See LILCO*, 666 F.Supp. at 397–98.

Likewise, the court here is compelled to reject as premature CECOS' claim based upon the theory that the new siting law constitutes a "taking" in violation of the fourteenth amendment due process clause. At this juncture there is no way to ascertain whether the new siting law "goes too far" because although it clearly applies to CECOS, the economic effect of its applica-

tion on CECOS' property is unknown. What effect, if any, the new siting law will have on CECOS' Niagara Falls solid waste management facility cannot be determined until the siting board decides whether CECOS qualifies for a certificate under the new siting law.

### B. Property Interest

■ The first inquiry with respect to the second component of CECOS' due process argument is "whether the property rights which [plaintiffs] claim they were deprived of could have constituted protected 'property interests' within the meaning of the fourteenth amendment." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988). Although the Supreme Court has recognized that "property interests . . . may take many forms," the scope of property interests protected by the fourteenth amendment is not unlimited. *Board of Regents v. Roth*, 408 U.S. 564, 575, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). In *Roth*, the Supreme Court explained that "to have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Property interests are not derived from the Constitution. *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Rather, courts must look to "[e]xisting rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

In the present case then it is necessary to discern the exact nature of the property interest of which CECOS claims it was deprived, and the basis for that claimed interest. Although not explicitly stated, it can certainly be inferred from CECOS' papers that it is claiming that it has a protectible property interest in an unchanging permit application process. CECOS' discussion of its due process claim is replete with statements such as it expected DEC approval of its permit; that it "anticipated

favorable action on its application by the DEC;" and that it relied upon the "stability of a predictable system of laws." *See* Plaintiff's Memorandum of Law at p. 24, 27–28. Therefore, the issue before the court is whether CECOS' expectation of obtaining a permit under a given procedure rises to the level of a property interest entitled to due process protection.

As this court has previously recognized, "there is no property interest in a procedure itself." *Beacon Syracuse Associates v. City of Syracuse*, 560 F.Supp. 188, 195 (N.D.N.Y.1983) (citations omitted). *See also, Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Com'rs*, 811 F.2d 1371, 1377 n. 2 (10th Cir.1987) (and cases cited therein). That is so because there is a distinction between the process due and the protected property interest. Stated somewhat differently, "[i]n each due process case there must be a separate benefit (the property or liberty interest) and a separate procedure (the delineated process due)." *Id.* Here, CECOS' property interest and process due appear identical in that CECOS is alleging a deprivation of its property interest because of the state's failure to maintain a given set of procedures for obtaining a permit to develop hazardous waste landfills. Clearly that allegation is insufficient to show a benefit separate and distinct from a given procedure. Thus, the court cannot find a protectible property interest based upon CECOS' expectation of an unchanging permit process.

Moreover, even if the court analogizes CECOS's situation to those cases where courts have found a constitutionally protected property interest in an applicant's interest in a permit or license, the court is still not convinced that CECOS would have a protectible property interest under the standards enunciated therein. There are two leading cases in this Circuit pertaining to whether an applicant for a permit or license has a legitimate claim of entitlement under state law protected by the fourteenth amendment. In *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54 (2d Cir.1985), the Second Circuit adopted the following standard:

[T]he question of whether an applicant has a legitimate claim of entitlement to

the issuance of a license or certificate should depend on whether, *absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted.* Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment.

*Id.* at 59 (emphasis added). In the subsequent case of *Sullivan v. Town of Salem,* 805 F.2d 81 (2d Cir.1986), the Second Circuit explained that standard:

> By that standard we did not intend to remove from constitutional protection every application for a license or certificate that could, under any conceivable version of facts, be the subject of discretionary action; a theoretical possibility of discretionary action does not automatically classify an application for a license or certificate as a mere 'unilateral hope or expectation'. On the contrary, our standard was intended to be a tool capable of measuring particular applications to determine if the applicant had a legitimate claim of entitlement based on the likelihood that without the due process violation that application would have been granted.

*Id.* at 85.

Applying those principles to this case, the court is not convinced that CECOS has a property interest in the issuance of a permit in accordance with the procedure as it existed prior to the new siting law. As the state defendants cogently stated, it is difficult to understand how CECOS could have an expectation of DEC approval given the nature of DEC's adjudicatory system. Even assuming a DEC staff member indicated to CECOS that its permit would be approved under the prior permit process, CECOS' reliance upon that statement could not have created a constitutionally protected property right because there were other litigants involved in the adjudicatory process. The New York State Consumer Protection Board was also a party to the hearing, contending that CECOS should have been subjected to siting board review even prior to the enactment of the new siting law.

In addition, the function of the DEC staff is to advocate a position before the ALJ, who in turn prepares a report and recommendation, which the Commissioner may accept, modify, or reject. Therefore, it is difficult to conceive of how CECOS's expectation of DEC approval could rise to the level of a protectible property interest, when the eventual decision would come from an independent adjudicatory arm of the agency. That is especially so given the wide latitude vested in the Commissioner pursuant to N.Y.Envtl.Conserv.Law § 27–0913(3).[15] Indeed, CECOS' own counsel apparently recognized that broad statutory discretion when he conceded in his affidavit that the hearing process extant prior to the new siting law could "potentially permit denial" of the final permit. Rigano Affidavit (9/9/87) at par. 7. Conse-

---

**15.** Section 27–0913 of the New York Environmental Conservation Law states:

1. No person shall engage in storage, treatment, or disposal, including, storage at the site of generation, of hazardous wastes without first having obtained a permit pursuant to title seven of this article.

2. No person shall engage in the transportation of hazardous wastes without first complying with the requirements of title three of this article.

3. The commissioner shall assure that permits authorizing hazardous waste treatment, storage, disposal or transportation are not issued to nor held by unqualified or unsuitable persons. To effectuate this purpose, and in addition to any other available grounds, the commissioner may, consistent with the policies of article twenty-three-A of the correction law and the provisions of section 70–0115 of this chapter, deny, suspend, revoke or modify any permit, renewal or modification thereto for the treatment, storage, disposal or transportation of hazardous waste, after determining in writing that such action is required to protect the public health and safety. Some of the factors which the commissioner may consider in arriving at his determination include the following:

a. The permit holder or applicant has been determined in an administrative, civil or criminal proceeding to have violated any provision of this article, any related order or determination of the commissioner, any regulation promulgated pursuant to this article, the condition of any permit issued thereunder, or any similar statute, regulation, order or permit condition of the federal or other state government.

quently, because the DEC was vested with broad discretion as to whether CECOS would actually receive a final permit for SCRF 6, even under the old system, the court concludes that CECOS has not shown, as it must, a legitimate claim of entitlement protected by the due process clause of the fourteenth amendment. Thus, CECOS' motion for summary judgment is denied and defendants' cross-motion is granted with respect to that issue.

Accordingly, it is hereby

ORDERED that:

(1) defendants' cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56 on plaintiffs' due process and equal protection claims is granted;

(2) plaintiffs' motion for summary judgment is denied; and

(3) the complaint is dismissed.

b. Such permit holder or applicant has been denied a permit for the same or substantially similar activity based upon one or more of the provisions of this subdivision, or a similar provision of federal or other state law.

c. Such permit holder or applicant has been found in a civil proceeding to have committed a negligent or intentionally tortious act, or has been convicted in a criminal proceeding of a criminal act involving the handling, storing, treating, disposing or transporting hazardous waste.

d. Such permit holder or applicant has been convicted of a criminal offense under the laws of any state or of the United States which involves a violent felony offense, fraud, bribery, perjury, theft, or an offense against public administration as that term is used in article one hundred ninety-five of the penal law.

e. Such permit holder or applicant has in any matter within the jurisdiction of the department knowingly falsified or concealed a material fact or knowingly submitted a false statement or made use of or made a false statement on or in connection with any document or application submitted to the department.

f. Such permit holder or applicant is either: (i) an individual who had a substantial interest in or acted as a high managerial agent or director for any corporation, partnership, association or organization which committed an act or failed to act, and such act or failure to act could be the basis for the denial of a permit pursuant to this section or regulations promulgated thereunder if such corporation, partnership, association or organization applied for a permit under this title;

(ii) a corporation, partnership, association, organization, or any principal thereof, or any person holding a substantial interest therein, which committed an act or failed to act, and such act or failure to act could be the basis for the denial of a permit pursuant to this section or regulations promulgated thereunder if such corporation, partnership, association or organization applied for a permit under this title; or

(iii) a corporation, partnership, association or organization or any high managerial agent or director thereof, or any person holding a substantial interest therein, acting as high managerial agent or director for or holding a substantial interest in another corporation, partnership, association or organization which committed an act or failed to act, and such act or failure to act could be the basis for the denial of a permit pursuant to this section or regulations promulgated thereunder had such other corporation, partnership, association or organization applied for a permit under this title.

N.Y.Envtl.Conserv.Law §§ 27–0913(1), (3) (McKinney 1984).