**CECOS INTERNATIONAL, INC., and Niagara Recycling, Inc., Plaintiffs–Appellants,**

v.

**Thomas C. JORLING, as Commissioner of the New York State Department of Environmental Conservation, and the New York State Department of Environmental Conservation, Defendants–Appellees,**

City of Niagara Falls, County of Niagara, Great Lakes United, LaSalle and Niagara Demand, Campaign to Save Niagara, Ecumenical Task Force of the Niagara

**Frontier, and Society to Oppose Pollution in Towns, Defendants–Intervenors–Appellees.**

No. 38, Docket 89–7310.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1989.

Decided Jan. 4, 1990.

James B. Rather, Uniondale, N.Y. (Steven Brock, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., of counsel, Barbara Guibord, Katten Muchin & Zavis, Chicago, Ill., of counsel), for plaintiffs-appellants.

Stuart Miller, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty.Gen., State of N.Y., John J. Privitera, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.

Michael B. Gerrard, New York City (Philip Weinberg, Berle, Kass & Case, New York City, of counsel), for defendants-intervenors-appellees, City of Niagara Falls and County of Niagara.

Brent K. Olsson, New York City (Milbank, Tweed, Hadley & McCloy, New York City, of counsel), filed letter brief for defendants-intervenors-appellees, Great Lakes United, LaSalle and Niagara Demand, Campaign to Save Niagara, Ecumenical Task Force of the Niagara Frontier, and Soc. to Oppose Pollution in Towns.

Before KAUFMAN, CARDAMONE, and FRIEDMAN,* Circuit Judges.

CARDAMONE, Circuit Judge:

The present appeal involves, among other issues, a constitutional challenge to a newly amended state law governing the expansion of commercial hazardous waste facilities in New York. The expansion of such a facility arouses considerable public concern, as is evident from the number of citizens' organizations intervening in this litigation. It is a truism that producing today's modern goods creates a negative trade-off to the better life these items afford because the by-products of their manufacture often constitute hazardous waste materials. This appeal presents another episode in the voluminous litigation between waste management facilities' operators and state regulators over what regulations should apply and "in whose backyard" the additional facilities are to be sited.

* Hon. Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

Plaintiffs, CECOS International, Inc. and Niagara Recycling, Inc. (collectively CECOS), appeal from a judgment dated February 23, 1989 in the United States District Court for the Northern District of New York (McCurn, J.), dismissing their complaint under 42 U.S.C. §§ 1983 and 1988 (1982) seeking a declaratory judgment that amendments to § 27–1105 of the New York State Environmental Conservation Law (ECL) violated the Due Process and Equal Protection Clauses of the United States Constitution by requiring CECOS to obtain siting board approval for an expansion. *CECOS Int'l, Inc. v. Jorling,* 706 F.Supp. 1006 (N.D.N.Y.1989). The district court denied CECOS' motion for summary judgment on their claims, and instead granted the cross-motion for summary judgment made by defendants, Thomas C. Jorling, Commissioner of the New York State Department of Environmental Conservation (Commissioner), and the New York State Department of Environmental Conservation (DEC). We affirm.

## BACKGROUND AND PRIOR PROCEEDINGS

CECOS has been operating a commercial hazardous waste landfill on a 385 acre site in Niagara County, New York since 1976. It operates one of only two such landfill operations in New York. The other is run by SCA Chemical Services, Inc. (SCA). Together CECOS and SCA handle 80 percent of the 280,000 tons of hazardous waste annually produced in New York, and also process much of the 100,000 tons transported annually into that state from other states. Presently, all of the five CECOS landfills, referred to as Secure Chemical Management Facilities, are filled to capacity and are no longer operational. The last facility, Facility No. 5, was filled in mid–1988.

Because of the time that elapses between the application for and the issuance of a final permit to operate a landfill, CECOS in 1984 began developing a sixth landfill, Secure Chemical Residue Facility No. 6 (Facility No. 6), and submitted an initial application for its approval on May 1, 1985. The DEC responded with a series of Notices of Incomplete Information and requests for additional information needed to satisfy state regulations. After two years during which CECOS invested in excess of seven million dollars in the new landfill, the DEC indicated that the application for Facility No. 6 was complete, and it thereupon issued a draft permit on February 25, 1987. An adjudicatory hearing was then commenced by the DEC before an Administrative Law Judge (ALJ), who continued the hearing until the late summer of 1987 pending the parties' submission of briefs on the issue of whether the siting law, as originally enacted, exempted CECOS from siting board review.

During this period, New York State Assembly Bill 7835–C, which amends the sections of the ECL governing the siting of new hazardous waste disposal facilities, was passed by both houses of the New York State Legislature. Under the old law, CECOS was not required to obtain a Certificate of Environmental Safety and Public Necessity from a siting board because it fell within a grandfather exception granted operators seeking to expand an existing facility. The newly passed amendments eliminate commercial land disposal facilities, such as CECOS, from the grandfather exception and specifically require it to obtain a certificate. N.Y.Envtl.Conserv.Law § 27–1105(2)(d) (McKinney 1989).[1]

1. The new siting law provides, in pertinent part:
   [N]o person may commence construction or operation of the following industrial hazardous waste treatment, storage and disposal facilities, ... without having received a certificate of environmental safety and public necessity from the facility siting board as hereinafter provided:

   .    .    .    .    .

   [T]he following industrial hazardous waste treatment, storage and disposal facilities shall not be subject to the provisions of this title:

   .    .    .    .    .

   (d) Additional facilities, *other than land disposal facilities,* to be located at the site of an existing facility, the operation of which will be substantially similar to that of the existing facility with respect to the mode of waste management and the type and quantity of hazardous waste being managed.

The new siting law also establishes four exceptions to the certificate requirement, including one for the expansion of non-commercial landfills—landfills which, unlike CECOS, dispose of hazardous wastes generated at the site of the facilities. N.Y. Envtl.Conserv.Law § 27–1105(2)(b) (McKinney 1989).[2] SCA also lost the grandfather exception, and it too is required to obtain a certificate under the amended law. In response to the New York State Legislature's passage of the new siting law, the ALJ suspended the adjudicatory hearing and remanded CECOS' application to the DEC to determine what additional information CECOS would be required to submit to complete its application under the new amendments, assuming that the Governor would sign them into law. Notice of the suspension of the hearing was contained in a memorandum dated July 21, 1987. On August 4, 1987 Governor Cuomo signed the amendments into law.

In order to resume the state administrative hearing on Facility No. 6, CECOS resubmitted its application on that facility in November 1987 including a request for a certificate from the siting board. The administrative hearing was reopened on March 29, 1988, a public statement hearing and an issues conference were held on March 30, 1988 and at that time the ALJ issued a ruling on the issues that would be covered in the actual adjudicatory hearing, which ultimately was held from August 3 through November 25, 1988. On August 21, 1989 after submission of posthearing and reply briefs and additional information was added to the record, the ALJ issued his recommendation that the siting board and Commissioner grant CECOS a certificate and permit for Facility No. 6. These documents have not been issued as of the date of this opinion.

About a month after the July 21, 1987 suspension, CECOS instituted this action in the United States District Court for the Northern District of New York on August 24, 1987 seeking a preliminary injunction barring the defendants, the DEC and its Commissioner, from enforcing the new siting law. CECOS sought, in addition, a judgment declaring that the amendments violated the Fourteenth Amendment's Due Process and Equal Protection Clauses. 706 F.Supp. at 1008. At oral argument, CECOS acknowledged that a preliminary injunction was not essential and agreed to convert its action into one for summary judgment. The district court granted the motions of the following parties to intervene as defendants: Great Lakes United, LaSalle and Niagara Demand, Campaign to Save Niagara, Ecumenical Task Force of the Niagara Frontier, and Society to Oppose Pollution in Towns (the concerned citizens' organizations), and the City of Niagara Falls and the County of Niagara (the municipal defendants).

On February 23, 1989 the district court granted defendants' cross-motion for summary judgment. With respect to the jurisdictional questions before it, the district court declined to abstain on the basis of the *Pullman, Younger,* or *Burford* doctrines and determined that the action against the DEC—but not the action against the Commissioner—was barred by the Eleventh Amendment. 706 F.Supp. at 1013, 1019, 1023, 1024. As to CECOS' constitutional challenges to the new siting law, the trial court decided that the law did not offend either the Equal Protection or the Due Process Clauses. *Id.* at 1028–29. This appeal, on the issues of *Younger* abstention and equal protection, followed.

## DISCUSSION

■ We are asked to decide whether the district court properly exercised jurisdiction

---

N.Y.Envtl.Conserv.Law § 27–1105 (McKinney 1989) (emphasis supplied).

**2.** Notwithstanding the provisions of subdivision one of this section, the new siting law provides an exception for

[a] land disposal facility located at the site of an existing land disposal facility where both the existing facility is or was and the pro-

posed facility will be used solely for the disposal of non-incinerable residues from the *on-site* thermal destruction or chemical or aqueous treatment of wastes *generated at the site of such facilities* [.]

N.Y.Envtl.Conserv.Law § 27–1105(2)(b) (McKinney 1989) (emphasis supplied).

and whether the new siting law is preempted by federal law or violative of the Equal Protection and Commerce Clauses of the United States Constitution. Because neither the preemption nor Commerce Clause contentions were pleaded or argued to the district court, we decline to hear these issues on appeal. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 37, 96 S.Ct. 2882, 2902, 49 L.Ed.2d 752 (1976); *Ansol Co. v. Uniroyal, Inc.,* 448 F.2d 872, 886 (2d Cir.1971).

## I *Abstention*

■ We turn to appellees' argument that the district court should have abstained from exercising jurisdiction. To begin, federal courts have an unflagging obligation to adjudicate cases brought within their jurisdiction. It is now black-letter law that abstention from the exercise of federal jurisdiction is the narrow exception, not the rule. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983); *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

The traditional categories of abstention are set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). A residuary category of abstention premised on promoting the effective disposition of litigation and the husbanding of judicial resources was established in *Colorado River. See* 424 U.S. at 817, 96 S.Ct. at 1246. The refusal of the district court to abstain under *Younger* is the focus of the DEC's abstention challenge.

## A. Younger Abstention

Abstention under *Younger* is fueled by the notion that courts of equity should not intervene where a party has an adequate remedy at law, *see* 401 U.S. at 43, 91 S.Ct.

at 750, and by concerns of comity and federalism expressed in "the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." 401 U.S. at 44, 91 S.Ct. at 750. In *Younger,* the Supreme Court held that a federal district court could not enjoin an ongoing state criminal proceeding while it entertained constitutional challenges to the criminal statute under which the defendant was being prosecuted when such arguments could be heard and decided in the state proceeding. *Younger* abstention has been extended to civil proceedings, *see Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), and state administrative proceedings, so long as the state court has a means of reviewing constitutional claims, *see, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627–29, 106 S.Ct. 2718, 2722–23, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432–34, 102 S.Ct. 2515, 2521–22, 73 L.Ed.2d 116 (1982).

■ To justify a refusal to assume jurisdiction on *Younger* grounds, a district court must answer three questions affirmatively: (1) is there an ongoing state proceeding; (2) is an important state interest implicated; (3) does the plaintiff have an avenue open for review of constitutional claims in the state court? *Middlesex County Ethics Comm.,* 457 U.S. at 432, 102 S.Ct. at 2521; *see also Christ the King Regional High School v. Culvert,* 815 F.2d 219, 224 (2d Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). In this case the district court believed that the first and second questions should be answered in the affirmative, but because it believed that the state courts would not hear CECOS' constitutional challenge, it answered the third question in the negative and declined to abstain.

■ The district court reached its conclusion based on a belief that CECOS' constitutional challenge to the new siting law was unavailable in an Article 78 proceeding seeking review of the DEC's decision on

Facility No. 6. 706 F.Supp. at 1017–19. We agree that under New York law an Article 78 proceeding testing the results of an administrative adjudication is not the proper vehicle to challenge the constitutionality of a legislative enactment on its face. *Board of Educ. v. Gootnick,* 49 N.Y.2d 683, 687, 427 N.Y.S.2d 777, 404 N.E.2d 1318 (1980); *University Club v. City of New York,* 842 F.2d 37, 40 (2d Cir.1988). Yet, the question of whether the statute has been *applied* in an unconstitutional fashion may be raised directly in an Article 78 proceeding. *See Koversky v. Housing & Development Administration of City of New York,* 31 N.Y.2d 184, 191, 335 N.Y. S.2d 383, 286 N.E.2d 882 (1972); *University Club,* 842 F.2d at 40. Further, where all the necessary parties are present before Special Term, it may test the constitutionality of the statute itself by treating the Article 78 petition challenging the statute on its face as a declaratory judgment action. *Koversky,* 31 N.Y.2d at 192, 335 N.Y. S.2d 383, 286 N.E.2d 882; *Lakeland Water Dist. v. Onondaga County Water Auth.,* 24 N.Y.2d 400, 408–09, 301 N.Y.S.2d 1, 248 N.E.2d 855 (1969). In light of this, we cannot assume that New York's procedures are inadequate to provide plaintiff a forum to review its constitutional claims. *See University Club,* 842 F.2d at 40 (adequate opportunity to raise constitutional claims is provided by opportunity to raise them in judicial review of administrative action). Hence, contrary to the district court's conclusion, the question of opportunity for judicial review should be answered in the affirmative.

The trial court also determined that there was an ongoing state proceeding on Facility No. 6 based upon CECOS' original application for a permit under the former siting law. Specifically, it found that the Facility No. 6 proceeding was ongoing because it had not been terminated—but only held in abeyance in July 1987—prior to the filing of the instant federal suit. In this analysis, we think the district court was mistaken.

### B. No Ongoing State Proceedings

Whether CECOS' original administrative application was "ongoing" at the time CE-

COS brought its federal court action requires us to examine both the circumstances of that application and the ALJ's memorandum "suspending" that proceeding. CECOS originally made its application while the old siting law was in effect. Under the terms of that law, CECOS had a grandfather exemption from the certification requirement, and therefore had no reason to assume that it would have to raise any constitutional challenges to the siting law before the ALJ. The constitutional challenges raised in the federal court action are not aimed at the old siting law under which CECOS originally filed its application. Rather, CECOS challenges only the amended siting law that came into existence *after* CECOS initiated the original application proceeding. In short, CECOS could not have raised its federal claims in the original administrative proceeding until the Governor signed into law the amendments that are the subject of those claims.

When the amendments were passed by the state legislature, the ALJ presiding over CECOS' application proceedings "suspended" the proceedings and remanded the matter to the DEC for it to indicate to CECOS what additional information was necessary under the new law. Although the ALJ initially characterized his order as a "suspension" of the proceedings, he later indicated that it more likely could be characterized as a dismissal without prejudice of the original application, stating

> Of course, it is the Applicant's prerogative to withdraw or modify the application or *to pursue any other legal avenue available.* When any such further processing of the application has been completed, the hearing would presumably be rescheduled jointly before a siting board and the Department, *and the proceedings would begin anew. In the event the bill does not become law,* we will resume the proceedings begun after the issues conference of June 3, 1987.

CECOS International Inc., Memorandum of Administrative Law Judge (July 21, 1987).

In light of the language used by the ALJ indicating that he had, in effect, *dismissed*

CECOS' original application with leave to file a new application under the amended siting law, it is apparent that the original state administrative proceedings under the old law ended as of the ALJ's "suspension." Hence, there was no ongoing state proceeding when CECOS filed its action in federal court on August 24, 1987.

In concluding that there was an ongoing state proceeding the district court relied on the fact that the application proceeding was "reopened" on March 29, 1988, and was continuing as of the point in time when the district court drafted its opinion. 706 F.Supp. at 1016. As the district court itself noted, this new hearing resulted from a reapplication that CECOS made under the new siting law in November 1987—approximately three months after it filed the instant federal action. *Id.* at 1012. The ongoing proceeding upon which the district court relied did not begin therefore until after CECOS had brought its federal action under § 1983 and § 1988.

■ Under the circumstances, there was no state judicial or administrative proceeding pending that warranted *Younger* abstention at the time CECOS filed its federal suit. A federal court need not stay its jurisdictional hand when there is no state action pending at the time the federal suit is filed, even if there is a substantial likelihood that a state proceeding will be instituted in the future to vindicate the state's interests. *See Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971) ("We would negate the history of the enlargement of the jurisdiction of the federal district courts, if we held the federal court should stay its hand and not decide the question before the state courts decided it.").

Further support for permitting CECOS access to federal court is found in *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), where the Supreme Court held that a plaintiff is not required to exhaust state judicial or administrative remedies before bringing a § 1983 action. *Id.* at 506–07, 102 S.Ct. at 2562–63. The legislative history of § 1983 reflects Congress' aim "to provide dual or concur-

rent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief." *Id.* at 506, 102 S.Ct. at 2563; *see also* Chemerinsky, *Parity Reconsidered: Defining a Role for the Federal Judiciary,* 36 UCLA L.Rev. 233 (1988) (proposing that litigants be afforded the choice of whether to present federal constitutional challenges in federal or state court).

CECOS was therefore entitled to seek relief either by instituting a declaratory judgment action in federal court asserting that it has a viable cause of action under § 1983 and § 1988, or by petitioning a state court in an Article 78 proceeding to review the action taken by the siting board. CECOS chose the former course. It may not be precluded from asserting its rights under § 1983 and § 1988 and having a federal court review its constitutional challenges to an amended state law simply because it had filed an application for a permit before the challenged amendment was enacted.

## II *Equal Protection*

■ CECOS argues that the state statute violates the Equal Protection Clause. The Equal Protection Clause of the Fourteenth Amendment directs that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV, § 1. CECOS claims that the new siting law treats commercial hazardous waste treatment facilities more harshly than non-commercial facilities. When the claimed discrimination is not based on race, alienage, national origin, sex, or illegitimacy, the test is whether there is a rational relationship between the legislation and a legitimate state interest. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). CECOS cannot meet its burden of proving that the new law's requirement of siting board certification for commercial hazardous waste facilities is without a rational purpose.

CECOS asserts that the state changed the rules in the middle of the game. Quite plainly, the state legislature realized that it

should not grant an exemption to operators planning an expansion of an existing commercial facility from going through the siting certification process. The Assembly of the State of New York, *Record of Proceedings* 12 (July 10, 1987). The state provided cogent reasons for requiring siting board approval for expansion of commercial—but not non-commercial—hazardous waste facilities, all of which were found to be legitimate by the district court. The state noted first that commercial facilities are more likely to expand because their profits are based upon the number of operating facilities whereas non-commercial facilities, sited on the premises of the waste generator, lack a profit motive. Second, the state suggested that there are greater risks associated with commercial facilities because hazardous wastes must be transported to the off-site commercial facility. Third, it proposed that siting board review would prevent a particular area of the state from housing too many commercial facilities, thereby receiving a disproportionately large share of the state's hazardous wastes. Fourth, it believed that the gravity of the problem of expanding hazardous waste facilities merited review by both the DEC and the siting board, and it chose to proceed "one step at a time insofar as requiring siting board certifications is concerned." *See* 706 F.Supp. at 1027–28.

The thrust of CECOS' argument is that the true purpose behind the legislation was to prevent the expansion of CECOS, and that the state proffered reasons after the fact in an attempt to rehabilitate the statute. It claims that statements made by the assemblymen sponsoring the new siting law and not-in-my-backyard rhetoric prove that the actual purpose is to discriminate against CECOS.

CECOS' assertion that these statements, in and of themselves, reveal the discriminatory purpose of the new siting law is a shot wide of the mark. Even were we to hazard a guess at the "true" motives of lawmakers who vote on a bill, the Supreme Court admonishes us that "[i]nquiries into [lawmakers'] motives or purposes are a hazardous matter.... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, ..." and guesswork in this area is valueless conjecture. *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968); *see also Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of [those] who voted for it."); *Washington v. Davis*, 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring) ("A law conscripting clerics should not be invalidated because an atheist voted for it."). Hence, the sponsor's statements and bias against hazardous waste treatment facilities may not carry the day on the issue of whether the new siting law is without a legitimate purpose.

CECOS' reliance upon *Cleburne* and *LILCO v. Cuomo*, 666 F.Supp. 370 (N.D.N.Y.1987), is inapposite. In both cases there was no purpose for the legislation other than discrimination against the plaintiffs. In *Cleburne*, there was no legitimate reason for the city to require a special use permit for a proposed group home for the mentally retarded, but not for apartment houses, fraternity and sorority houses, hospitals or other group homes. *See* 473 U.S. at 447–48, 105 S.Ct. at 3258–59. In *LILCO*, the statute effected only the Shoreham nuclear plant, and the court concluded that "an impartial legislator could not have logically concluded that the [statute] 'would serve a legitimate public purpose....'" 666 F.Supp. at 425.

In the present case, another facility (SCA) is equally effected by the new siting law, and the reasons for distinguishing between commercial and non-commercial facilities articulated by the state are legitimate. Thus, the new siting law cannot be said to violate the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, we hold that the district court had jurisdiction over this matter. We also conclude that New York's amended siting law is not violative of the

Equal Protection Clause of the Constitution.

The judgment appealed from is accordingly affirmed.